**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| INTELLIVEST SECURITIES, INC.,<br>   Plaintiff,<br>              v.<br>WAVE EQUITY PARTNERS LLC, *et al.*,<br>   Defendants. | Civil Action No.<br>1:24-cv-01644-SDG |

**OPINION AND ORDER**

This case is before the Court on the petition by Plaintiff Intellivest Securities, Inc. to compel arbitration of its dispute with Defendants Wave Equity Partners LLC; Wave Equity Fund II, L.P.; Wave Equity II, GP, LLC; and Wave Equity Fund II (NQP), L.P. regarding allegedly unpaid securities commissions [ECF 1]. For the reasons stated below, the petition is **DENIED**.

**I.   Factual Background**

Intellivest is a broker-dealer and registered investment advisor that specializes in helping raise capital from investors "desiring to receive a fair rate of return while making a positive social impact," often referred to as "impact investing" or "environmental, social, governance investing."[1] Wave Equity Partners, LLC (Wave) is a registered investment advisor which serves as the

---

[1]   ECF 4-2, at 4; ECF 1, ¶¶ 1, 14 n.2. Intellivest filed an affidavit of its chief executive officer (and attorney of record) Daniel Kolber attesting that the allegations in the complaint are true and correct. ECF 4-3.

1

investment advisor for Wave Equity Fund II, L.P.[2] Wave Equity Fund II, GP, LLC is the general partner of Wave Equity Fund II, L.P.[3] Wave Equity Fund II (NQP), L.P. is a "parallel fund" to Wave Equity Fund II, L.P.[4]

The dispute also involves several non-parties. Intellivest attests that Michael Whelchel and Shawn Lesser were registered representatives of Intellivest and simultaneously owned a company named Big Path Capital, LLC, "a consulting group that specializes in familiarizing fund managers, companies, and people around the world with the emerging impact and sustainable sectors."[5] According to Intellivest, Whelchel, Lesser, and several others resigned from Intellivest on March 27, 2018, and joined another broker-dealer, non-party Growth Capital Services, Inc.[6]

As relevant to Intellivest's petition to compel arbitration, Intellivest states that it negotiated an agreement with Defendants pursuant to which Defendants would make a presentation at an Intellivest-sponsored event called the "22nd Five

---

[2]   ECF 18, ¶ 17.

[3]   *Id.* ¶ 19.

[4]   *Id.* ¶ 20.

[5]   ECF 1, ¶¶ 2, 10 n.1; ECF 4, at 7. Defendants dispute this characterization. *See* ECF 18, ¶ 10.

[6]   ECF 1, ¶ 3.

Fund Forum," to take place in March 2018.[7] In exchange, Defendants agreed to pay Intellivest 2% of the capital that Defendants raised from investors introduced to them by Intellivest.[8] The purported agreement, titled the "Event Engagement Letter," also included a clause requiring the parties to arbitrate any disputes under the rules of FINRA.[9] The Event Engagement Letter was structured to be an agreement between a "presenter" (presumably Defendants), Intellivest, and Big Path.[10]

The Event Engagement Letter submitted by Intellivest is a blank form and does not identify Wave—or anyone else—as the presenter.[11] Intellivest also admits that the Event Engagement Letter was not signed by any party.[12] However, Intellivest presents several arguments as to why Defendants should be compelled to arbitrate the instant dispute with FINRA: (1) Defendants expressly agreed to the terms of the unsigned Event Engagement Letter by email; (2) Defendants manifested their assent to the terms of the unsigned Event Engagement Letter by presenting at the Five Fund Forum; and (3) Defendants subsequently entered into

---

[7] *Id.* ¶¶ 57–58.

[8] *Id.*

[9] *Id.* ¶ 24; *see also* ECF 4, at 7, 16.

[10] ECF 4, at 7, 17.

[11] *Id.*

[12] ECF 1, ¶ 71; *see also* ECF 4, at 17.

a different agreement with Big Path and Growth Capital which included a clause requiring those entities to arbitrate any disputes under the rules of FINRA.[13]

The parties generally agree that the email conversations submitted by Intellivest—dated between February 6 and 22, 2018—form the heart of the arbitration dispute.[14] While Defendants dispute Intellivest's characterization of the events, they do not necessarily dispute the events themselves. According to Defendants, Wave—but not the remaining Defendants—negotiated with representatives of Big Path for Wave to present at the Five Fund Forum in March 2018.[15] Defendants assert that Intellivest was not a party to their discussions with Big Path.[16] Wave's discussions with Big Path culminated in a signed "Speaker Engagement Letter" between Wave and Big Path for Wave to present at the Five Fund Forum in exchange for a $25,000 fee paid to Big Path.[17] The terms of the Speaker Engagement Letter vary considerably from the unsigned Event Engagement Letter.[18]

---

[13]   ECF 4-2.

[14]   ECF 17-1, ¶ 2.

[15]   *Id.*

[16]   *Id.* ¶ 5.

[17]   *Id.* ¶ 4, Ex. 1.

[18]   *Compare id.* at Ex. 1, *with* ECF 4, at 7–17.

Lastly, in May 2018, Wave, Big Path, and Growth Capital entered into a "Broker Dealer Services Agreement," pursuant to which Wave engaged Big Path and Growth Capital to provide certain services in connection with a proposed private placement of securities by Wave.[19] The Broker Dealer Services Agreement included a FINRA arbitration provision.[20]

## II.   Procedural Background

Initially, Intellivest pursued arbitration against Defendants before FINRA in December 2020.[21] Defendants did not consent to the arbitration, so FINRA withdrew Intellivest's claim without prejudice.[22] Intellivest attempted once again to pursue FINRA arbitration against Defendants in December 2023, but Defendants once again declined to participate, and FINRA withdrew the claim against them.[23]

Intellivest filed its "Petition to Compel Arbitration / Complaint" in this Court on April 17, 2024.[24] The petition seeks to compel arbitration of Intellivest's claims against Defendants, but in the alternative Intellivest asks the Court to

---

19   *See generally* ECF 4-1.

20   *Id.* at 9–10.

21   ECF 1, ¶ 25.

22   *Id.*

23   *Id.* ¶ 26.

24   ECF 1.

consider the case on the merits.[25] The Court granted Defendants' motion for an extension of time to respond to the complaint, and Defendants filed their response to Intellivest's petition to compel arbitration and an answer to Intellivest's complaint on June 28.[26]

## III. Applicable Legal Standard

The Federal Arbitration Act reflects the strong federal policy in favor of arbitration. *Howsam v Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) (noting that the Supreme Court has "long recognized and enforced a 'liberal federal policy favoring arbitration agreements'")); *see also Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1146 (11th Cir. 2015) (citations omitted) ("The FAA places arbitration agreements on equal footing with all other contracts and sets forth a clear presumption—'a national policy'—in favor of arbitration."). That said, parties cannot be required to submit a dispute to arbitration unless they have agreed to do so. "[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (citations omitted); *see also Howsam*, 537 U.S. at 83; *AT&T Techs. Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).

---

25  *Id.*

26  ECFs 16, 17, 18.

"The threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract.' Absent such an agreement, 'a court cannot compel the parties to settle their dispute in an arbitral forum.'" *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004)).

State law governs whether the parties formed a contract. *Bazemore*, 827 F.3d at 1329 (citing *First Options*, 514 U.S. at 944); *see also Cogas Consulting, LLC v. Aeterna Zentaris Inc.*, 2018 WL 7253597, at *3 (N.D. Ga. Aug. 27, 2018) ("[T]his Circuit repeatedly has emphasized that state law generally governs whether an enforceable contract or agreement to arbitrate exists.") (internal citations and quotation marks omitted). Accordingly, "[t]he Court simply looks to whether contract formation is in dispute—either because Plaintiff or Defendant denies its existence—and then looks to governing state-law principles to resolve the formation dispute." *Cogas Consulting*, 2018 WL 7253597, at *3.

Under the Federal Arbitration Act, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. A summary judgment-like standard should be applied when assessing whether such a trial is necessary. *Bazemore*, 827 F.3d at 1333 (citing Fed. R. Civ. P. 56(a)). If there is no

genuine dispute of material fact, then the Court may "conclude as a matter of law" that the parties did (or did not) enter into an arbitration agreement. *Id.*

## IV. Discussion

Intellivest's petition to compel arbitration hinges on whether the parties formed an agreement to arbitrate their disputes. On the facts as presented, the Court concludes as a matter of law that there is no arbitration agreement between the parties because (1) there was no mutual agreement to the terms of the Event Engagement Letter, and (2) Intellivest has no basis to enforce an arbitration agreement in the Broker Dealer Services Agreement between Defendants and non-parties Big Path and Growth Capital.

### A. The parties did not mutually agree to the terms of the Event Engagement Letter.

Intellivest argues that Defendants agreed to the terms of the Event Engagement Letter in two ways: (1) by Wave representative Mark Robinson's email on February 20, 2018 at 11:58 AM stating "[w]e have a deal," and (2) by Wave's subsequent presentation at the Five Fund Forum. However, application of state law contract principles requires the opposite conclusion—that the parties did not agree to the arbitration provision.

Under Georgia law,[27] "[a]cceptance of an offer must be unconditional, unequivocal, and without variance of any sort; otherwise, there can be no meeting of the minds and mutual assent necessary to contract formation." *Nugent v. Myles*, 350 Ga. App. 442, 447 (2019) (quoting *Durham v. McLaughlin*, 286 Ga. App. 166, 166–67 (2007)). When a party to the alleged contract "varies even one term of the original offer," it is considered a counteroffer. *Costello Indus., Inc. v. Eagle Grooving, Inc.*, 308 Ga. App. 254, 257 (2011) (quoting *Lamb v. Decatur Fed. Sav. & Loan Ass'n*, 201 Ga. App. 583, 585 (1991)). "A counteroffer acts to reject and nullify the original offer." *Id.* If the original offeror does not renew its offer, there is no offer left for the other party to accept. *Id.*

At the outset, the Court notes that there is no obvious indication that even *Intellivest* assented to the terms of the Event Engagement Letter. The individuals included in the email conversation were, at various points: Robinson, Praveen Sahay, Charles Bridge, and Haskell Crocker of Wave; Whelchel, Lesser, Jyoti Aggarwala, and Christie Lange of Big Path; and Ian Mackenzie of Mira.[28] However, Intellivest attests that Whelchel and Lesser were "registered

---

[27] Intellivest argues the issue of contract formation under Georgia law. Defendants do not dispute that Georgia law applies but generally rely on the 11th Circuit's pre-*Bazemore* case law.

[28] *See generally* ECF 4, at 20–41. Mackenzie's role in the conversation appears to have been to introduce Big Path and Wave. *See id.* at 26–27.

representatives" of Intellivest,[29] so the Court will assume *arguendo* that Whelchel and Lesser had the authority to bind Intellivest to the contract. The Court will also assume for purposes of this Order only that Robinson was negotiating on behalf of all Defendants as parties to the purported contract, and not just Wave.

### 1. The parties' email communications

The parties' email communications do not evidence a mutual agreement to the terms of the Event Engagement Letter. On February 13, 2018, Whelchel sent Robinson the blank Event Engagement Letter.[30] On February 19, Robinson sent an email to Lesser stating that "the Additional Fee of 2% is not appropriate" and proposing, among other things, a different fee structure.[31] Because Robinson varied the terms of the original offer, in particular the fee provided by the blank Event Engagement Letter, Robinson's February 19 email was a counteroffer and consequently a rejection of the terms of the Event Engagement Letter.

Lesser's response to Robinson's February 19 email was a flat rejection of Robinson's counteroffer. Lesser stated that the 2% fee was not negotiable, and further there was "[n]o need to go thr[ough] the other points [if] that is a show

---

[29]   ECF 1, ¶ 2.

[30]   ECF 4, at 20.

[31]   *Id.* at 40.

stopper."[32] Robinson and Lesser continued to negotiate the contours of the fee, and on the same day Lesser offered Robinson a 50% credit for an event fee towards the 2% additional fee.[33] Robinson agreed to Lesser's proposal, responding "[w]e have a deal! We'll mark up the contract."[34]

At this point, the terms of the Event Engagement Letter had been rejected by Robinson's original counteroffer, and Lesser expressly limited the negotiation to the 2% additional fee. The only offer outstanding was Lesser's proposal for the structure of the 2% fee, and Robinson's acceptance was necessarily limited to Lesser's proposal.[35] *See White v. Cheek*, 360 Ga. App. 557, 562 (2021) (citation omitted) ("[A]n answer to an offer will not amount to an acceptance, so as to result in a contract, unless it is unconditional and identical with the terms of the offer."). Therefore, the arbitration agreement in Paragraph 11 of the Event Engagement Letter was not part of the parties' agreement at this stage of the negotiation. Because the parties did not form an agreement to arbitrate their disputes before FINRA through the email conversation, Intellivest cannot compel Defendants to arbitrate their disputes on this basis.

---

[32] *Id.* at 39.

[33] *Id.* at 38–39.

[34] *Id.* at 37.

[35] The Court does not decide whether these actions constitute a valid contract as to the fee.

### 2.   Wave's presentation at the Five Fund Forum

Wave's presentation at the Five Fund Forum does not alter the conclusion that the parties did not mutually agree to the terms of the Event Engagement Letter, because there is no evidence that Whelchel or Lesser renewed their offer for the remaining terms of the Event Engagement Letter, including the FINRA arbitration provision.

As previously noted, Robinson's counteroffer on February 19, 2018 served as a rejection of the terms of the Event Engagement Letter, and the parties' subsequent negotiations were expressly limited to the structure of the 2% fee. There is no evidence that Whelchel or Lesser renewed their offer of the remaining terms of the Event Engagement Letter, including the provision for FINRA arbitration. Because Robinson rejected the terms of the Event Engagement Letter, and the subsequent negotiations were limited to the structure of the 2% fee, there was no offer including the FINRA arbitration provision for Defendants to accept.

"A counteroffer operates to reject an offer and to terminate the power of acceptance," and "as the counteroffer acted to reject immediately and nullify the original offer, any subsequent performance on the part of [the counter-offeror] could not unilaterally breathe life into the then non-existing original offer." *Lamb*, 201 Ga. App. at 585–56. Wave's presentation at the Five Fund Forum could not by itself reanimate the Event Engagement Letter, or the FINRA arbitration provision

therein. Therefore, there was no offer of FINRA arbitration for Wave to accept by presenting at the Five Fund Forum.

Intellivest's case law in support of its position on this point does not address the issue of a counteroffer serving as a rejection of the original offer. *See Del Lago Ventures, Inc. v. QuikTrip Corp.*, 330 Ga. App. 138 (2014); *Engineered Floors, LLC v. Lakeshore Equip. Co.*, 2021 WL 857741 (N.D. Ga. Mar. 8, 2021); *Athon v. Direct Merchants Bank*, 2007 WL 1100477 (M.D. Ga. Apr. 11, 2007); *Leslie v. Barclays Bank Del.*, 2017 WL 8220505 (N.D. Ga. Oct. 13, 2017), *report and recommendation adopted*, 2018 WL 1320082 (N.D. Ga. Jan. 3, 2018); *Honig v. Comcast of Ga. I, LLC*, 537 F. Supp. 2d 1277 (N.D. Ga. 2008); *Comvest, L.L.C. v. Corp. Sec. Grp., Inc.*, 234 Ga. App. 277 (1998). While it is generally true that "[i]f one of the parties has not signed, his acceptance is inferred from a performance under the contract, in part or in full, and he becomes bound," *Del Lago*, 330 Ga. App. at 144, Intellivest's cases do not address the effect of Robinson's counteroffer and the parties' subsequent negotiations. As noted above, "[a] counteroffer acts to reject and nullify the original offer," and "[i]f the original offer was nullified and not renewed by [the offeror], there was no offer left . . . to accept." *Costello Indus., Inc. v. Eagle Grooving, Inc.*, 308 Ga. App. 254, 257 (2011).

Accordingly, Wave's presentation at the forum is not a basis for Intellivest to compel Defendants to arbitrate their dispute with FINRA.

### B. Intellivest has no basis to enforce an arbitration agreement in the Broker Dealer Services Agreement between Defendants and non-parties Big Path and Growth Capital.

Intellivest also argues that because Wave entered into the Broker Dealer Services Agreement with Big Path and Growth Capital, which also contained a provision for FINRA arbitration, Defendants should be compelled to arbitrate the instant dispute. However, Intellivest is not a party to the Broker Dealer Services Agreement,[36] and Intellivest does not identify any other basis to compel arbitration based on an agreement to which it was not a party.

The arbitration provision in the Broker Dealer Services Agreement provides that "[a]ny dispute that may arise between [Wave] and [Big Path] shall be subject to arbitration under the rules of FINRA."[37] Thus, by its plain terms the arbitration provision covers only disputes between Wave and Big Path. The Broker Dealer Services Agreement also shows that it was executed by Wave (signed by Robinson) and Big Path (signed by Whelchel) on May 8, 2018.[38] Intellivest attests that Whelchel resigned from Intellivest on March 27, 2018,[39] and absent any other

---

36 *See generally* ECF 4-1.

37 *Id.* at 9–10.

38 *Id.* at 11.

39 ECF 1, ¶ 3.

evidence on this point there is no basis for Whelchel and Big Path's actions to be attributed to Intellivest.

While it is true that "a nonparty to an arbitration agreement may force arbitration 'if the relevant state contract law allows him to enforce the agreement,'" *Nat'l Freight, Inc. v. Consol. Container Co., LP*, 166 F. Supp. 3d 1320, 1325 (N.D. Ga. 2015) (quoting *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1170 (11th Cir. 2011)), Intellivest has not identified any basis in Georgia or Delaware[40] law to allow it to compel arbitration of its disputes with Defendants based upon the Broker Dealer Services Agreement to which it was not a party. Intellivest cites 17 C.F.R. § 230.152 (Rule 152) for the proposition that the Broker Dealer Services Agreement and the Event Engagement Letter involved the same securities offering by Wave, and therefore Wave must submit this dispute to arbitration. Of course, Wave is not the entity bringing this dispute in the first instance.

More importantly, Rule 152 does not affect the application of the Broker Dealer Services Agreement's arbitration provision under state law contract

---

[40] The Broker Dealer Services Agreement contains a Delaware choice of law clause. ECF 4-1, at 9–10. However, there is no apparent conflict between Georgia and Delaware law on this point. *Kuroda v. SPJS Holdings, L.L.C.*, 2010 WL 4880659, at *3 (Del. Ch. Nov. 30, 2010) (holding that "[g]enerally, only parties to a contract and intended third-party beneficiaries may enforce or be bound by that agreement's provisions, whereas a nonparty to a contract has no legal right to enforce it," but recognizing potential exceptions "under principles of contract and agency common law.").

principles. Rather, Rule 152 involves "determining whether two or more offerings are to be treated as one for the purpose of registration or qualifying for an exemption from registration under [the Securities Act of 1933]." 17 C.F.R. § 230.152(a); *see also In re Bd. of Dirs. of Multicanal S.A.*, 340 B.R. 154, 174 (Bankr. S.D.N.Y. 2006) ("Rule 152 has been described as an exception to the SEC's 'integration doctrine,' which provides that an issuer cannot use two or more exemptions to avoid registration of what is in reality a single transaction and determines what constitutes a single offering for purposes of registration.") (applying an earlier version of Rule 152). In short, Rule 152 is simply inapplicable to the Court's analysis of the scope of the arbitration provision in the Broker Dealer Services Agreement. Intellivest has no basis to compel arbitration of its dispute with Defendants based upon the arbitration provision in the Broker Dealer Services Agreement.

**V.    Conclusion**

Intellivest's petition to compel arbitration [ECF 1] is **DENIED**.

**SO ORDERED** this 10th day of March, 2025.

Steven D. Grimberg
United States District Judge